UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------------X

NATASHA SLATER,

                            Plaintiff,

                    -against-

P.O. KAREN MACKEY #2267, TAX ID 4000 63RD
PRECINCT NYPD; P.O. DANIEL YOUNG, TAX
ID 4000 63RD PRECINCT, NYPD; THE CITY OF
NEW YORK; NEW YORK CITY POLICE
DEPARTMENT, 63RD PRECINCT; CHILD
PROTECTIVE SPECIALIST: CHARMAINE
MCDONALD, ACS #6666517, UNIT #: 181-3 NEW
YORK CITY ADMINISTRATION FOR CHILD
SERVICES DCP/BROOKLYN FIELD OFFICE,

                            Defendants.

------------------------------------------------------------------X

NICHOLAS G. GARAUFIS, United States District Judge.

**MEMORANDUM & ORDER**

**12-CV-04325 (NGG) (RML)**

On October 18, 2013, pro se Plaintiff Natasha Slater ("Slater" or "Plaintiff") filed an

Amended Complaint asserting numerous causes of action against Police Officers Karen Mackey

and Daniel Young (together, "Police Defendants"), the New York City Police Department

("NYPD"), the 63rd Precinct, Charmaine McDonald ("McDonald"), the New York City

Administration for Child Services ("ACS"), and the City of New York (the "City") (collectively,

"Defendants"). (Am. Compl. (Dkt. 16).) Slater's claims center on her arrest for allegedly

assaulting her daughter (referred to by the court as "A.F.") in 2012, her subsequent indictment on

charges of robbery and assault, and the Neglect Petitions eventually brought against her by ACS,

which resulted in her three children being removed. On October 3, 2014, Defendants filed their

fully briefed motion to dismiss. (Not. of Mot. to Dismiss (Dkt. 32).) For the reasons stated

below, the court construes the motion to dismiss as a motion for summary judgment and

GRANTS IN PART and DENIES IN PART Defendants' motion for summary judgment.

1

# I.   CONVERSION INTO MOTION FOR SUMMARY JUDGMENT

"If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56. All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d). "The essential inquiry" in deciding whether it is proper to treat a motion to dismiss as a motion for summary judgment "is whether the non-movant 'should reasonably have recognized the possibility that the motion might be converted into one for summary judgment or was taken by surprise and deprived of a reasonable opportunity to meet facts outside the pleadings.'" Krijn v. Pogue Simone Real Estate Co., 896 F.2d 687, 689 (2d Cir. 1990) (quoting Nat'l Ass'n of Pharm. Mfrs., Inc. v. Ayerst Labs., 850 F.2d. 904, 911 (2d Cir. 1988)); see also Lawrence v. City of Rochester, No. 09-CV-6078 (FPG), 2015 WL 510048, at *4 (W.D.N.Y. Feb. 6, 2015). When both parties request that evidence outside the pleadings be considered, the risk of surprise or a party being deprived of a reasonable opportunity to meet the facts is low and conversion to summary judgment is proper. See Gurary v. Winehouse, 190 F.3d 37, 43 (2d Cir. 1999) ("[I]t was plaintiff who submitted the affidavit relied upon by the district court and who thus invited [the district court] to rely not only on the complaint, but upon the more elaborate explication of plaintiff's grievance contained in his affidavit. He certainly cannot be heard to claim that he was surprised when the district court accepted his invitation."); see also Facciolo v. City of New York, No. 09-CV-1332 (DGT) (JMA), 2010 WL 3155251, at *3 (E.D.N.Y. Aug. 6, 2010) ("In this case, by including an affidavit with their opposition papers and by explicitly recognizing the possibility of conversion in those papers, plaintiffs should have been aware of the likelihood of conversion."); Roberts v.

Phillips, No. 06-CV-2866 (LAP) (THK), 2009 WL 3241525, at *1 n.2 (S.D.N.Y. Sept. 30, 2009).

Here, Plaintiff appended over 100 pages of materials to her Amended Complaint. Although Defendants suggested that the court could still treat their motion as a motion to dismiss, they alternatively, "request[ed] that the Court convert the motion to a motion for summary judgment and decide the case based on the documents annexed to the Amended Complaint." (Mem. in Supp. of Defs.' Mot. to Dismiss the Am. Compl. ("Defs.' Mem.") (Dkt. 33) at 5 n.4.) Defendants also annexed their own exhibit to the memorandum. (Id. at ECF pp. 36-39.) Moreover, Defendants notified Plaintiff that their motion to dismiss could be converted by the court into a motion for summary judgment and accordingly, she should respond with evidence. (See Not. to Pro Se Litigant Who Opposes a Rule 12 Mot. Supported By Matters Outside the Pleadings (Dkt. 34).) Plaintiff responded by annexing additional evidence to her opposition brief (Exs. (Mem in Supp. of Pl.'s Am. Compl. ("Pl.'s Mem.") (Dkt. 31), Exs. 1-2 (Dkts. 31-1, 2)), and requesting that the court review "all paperwork" in making its decision (Pl.'s Mem. at 2). Accordingly, the court deems it proper to convert Defendants' motion to dismiss into a motion for summary judgment.

## II.   BACKGROUND

### A.   Factual Allegations

The facts are drawn from the Amended Complaint and the exhibits thereto, the Notice of Amended Complaint, and the exhibits to both Plaintiff's and Defendants' briefs submitted in connection with Defendants' motions. Except as otherwise noted, the following facts are undisputed. Where facts are in dispute, the court credits Slater's version of the particular fact, if

supported by record evidence.[1] The court has not included in this section facts introduced by the parties that are not material to Slater's claims.

## 1. The Arrest of Plaintiff

On June 1, 2012, the Statewide Central Register ("SCR") received a call concerning "safety concerns of Lacerations Bruises Welts Inadequate Guardianship [sic]." (Investigation Progress Notes (Am. Compl., Ex. F. (Dkt. 16-1)) at ECF p. 29; see also id. at ECF p. 39.) The caller stated that on May 24, 2012, Slater became upset with her daughter, A.F.[2] and "slapped her in the face, punched her in the face and threw her on the floor" in the presence of Slater's other two children. (Id. at ECF p. 29.) The caller alleged that A.F. suffered bruising to her left eye and one of her arms. (Id.) The caller further indicated that A.F.'s injuries had not been observed until June 1 because A.F. had been kept out of school from May 24 until June 1 and Slater had taken A.F.'s phone. (Id. at ECF p. 31.) The caller alleged that Slater had a history with child protective services in Florida, where she previously lived. (Id.)

In response to the tip, ACS went to Slater's home to investigate the allegations. (Id.) ACS arrived at Slater's home on June 1 at 4:05 p.m. (Id.) At some point the NYPD was summoned. (Id.) Both ACS and the Police Defendants interviewed A.F. (Am. Compl. at ECF p. 4; see also Not. of Am. Compl. (Dkt. 15) at ¶ 1.) Following the interview, the Police Defendants asked Slater to accompany them to the precinct in order to continue the investigation. (Am. Compl. at ECF p. 4.) Slater responded by asking what the investigation concerned and

---

[1] Because Slater is proceeding pro se, the court has performed an independent review of the entire record submitted by the parties to determine whether there are disputed issues of material fact. See McClendon v. County of Nassau, No. 11-CV-0190 (SJF) (ETB), 2012 WL 4849144, at *2 (E.D.N.Y. Oct. 11, 2012); Williams v. City of New York, No. 06-CV-6601 (NGG), 2009 WL 3254465, at *1 n.1 (E.D.N.Y. Oct. 9, 2009). Likewise, the court will consider Slater's filings to be sworn statements so long as they are otherwise admissible. See Washington v. William Morris Endeavor Entm't, LLC, No. 10-CV-9647 (PKC), 2014 WL 4401291, at *1 n.1 (S.D.N.Y. Sept. 5, 2014); Geldzahler v. N.Y. Med. Coll., 746 F. Supp. 2d 618, 620 n.1 (S.D.N.Y. 2010).

[2] To protect their identities, the court refers to Slater's minor children by their initials.

whether she was being arrested; the Police Defendants did not respond. (Id.) Slater then tried to re-enter the home and make a phone call. (Id.) In response, Detective Young "blocked Plaintiff's pathway" back into the home and "scream[ed] in Plaintiff's face acting as if he was going to hit her if she tried to take another step." (Id.) Slater ultimately went to the precinct. (Id.)

At the precinct, A.F. and G.T.—two of Slater's children—were interviewed. (Investigation Progress Notes at ECF p. 32; see also Not. of Am. Compl. ¶ 1.) Both interviews occurred at 4:30 p.m. (Investigation Progress Notes at ECF pp. 32-33.) A.F. told both ACS and the NYPD that on May 24, 2012:

> "[S]he was in the car with her mother and her mother slapped her across the left side of her face and injured her left eye. She said mother continued to hit her when they got in the house. Child said she tried to hide under a desk in her room but her mother hit her with a belt and her fist. A.F. said she hit her head on the floor but her mother continued to hit her. She said she heard her little sisters crying and one of them tried to help her but the mother pushed the sister out of the way and continued to hit her."

(Id. at ECF p. 32.) A.F. further stated that "her mother also had a [child protective services] case in Florida and she believed her mother may have mental health issues because she heard the CPS worker in Florida ask her mother if she took her medication." (Id.) Finally, she stated that "when CPS came to the home . . . her mother started telling [G.T.] to lie and say she was injured by a cousin." (Id.) The Police Defendants observed that A.F. had a "bruise and red line under her left eye, bruises on her rights arm and a bruise on her left thigh, close to her knee." (Id. at ECF p. 33.) G.T. indicated that "nothing really" happened at home on May 24, 2012. (Id.) She could not explain the bruising on A.F.'s arm and leg. (Id.) ACS's interview records state that "it was obvious that [G.T] was lying and she seemed nervous." (Id. at ECF p. 34.)

5

At the same time that A.F. and G.T. were being interviewed, Slater was also interviewed at the precinct. (Id. at ECF p. 35.) Slater was told that she was being interviewed "regarding injuries to [A.F.]." (Id.) She responded that she "don't [sic] hit my children at all." (Id.) She was then informed by Detective Mackey that she was being arrested for second degree assault. (Id.)

At 5:35 p.m. on June 1, 2012, Slater was arrested at the precinct. (Am Compl. at ECF p. 4 ("When Plaintiff arrived to the precint [sic] and after the Defendants spoke with Plaintiff's children and the Plaintiff, Plaintiff was arrested and taken to jail."); Webcrims Case Details - Summary (Am. Compl., Ex. B (Dkt. 16-1)) at ECF p. 15 (indicating the time of the arrest).) Slater was charged with various crimes including robbery and numerous charges offenses to the assault of A.F. (the "A.F. Assault Charges"). (Am. Compl. at ECF p. 4, 6, 7; Webcrims Case Details – Charges (Am. Compl., Ex. B (Dkt. 16-1)) at ECF p. 14.) All of the charges were eventually dropped. (Am. Compl. at ECF p. 15.)

### 2.    The Investigation Continues

After the arrest, ACS and the NYPD continued to investigate. At 6:15 p.m., ACS spoke to T.F.—Slater's third child—at Slater's home. T.F. stated that "sometimes her mother would 'slap me on my arm or leg with the hand and she used a belt couple [sic] times.'" (Investigation Progress Notes at ECF p. 33.) T.F. told ACS that her mother had beaten A.F. with a belt "a week or two ago." (Id.) T.F. described the alleged assault of A.F. as follows:

> [I]t happened in [A.F.]'s room, which is in the attic. [T.F.] said
> their mother thought [A.F.] was skipping school. She said their
> cousin, wrote some nasty stuff about boys on facebook and blamed
> it on A.F. . . . . [T.F.] said the argument with their mother and
> [A.F.] started in the car and continued when they got in the house.
> She said her mother hit [A.F.] with a belt. CPS asked how many
> time [sic] [A.F.] got hit with the belt and [T.F.] said she didn't see
> her get hit but she saw her mother take off [] a black leather belt

6

> and go upstairs to [A.F.]'s room. Child said she heard [A.F.] say
> ouch.

(Id. (internal quotation marks omitted.) T.F. further stated that following the assault, A.F. had a black eye. (Id.)

The NYPD also continued to investigate. For unknown reasons, Slater was placed in a lineup. At 6:15 p.m. on June 1, 2012, Slater was positively identified to Detective Mackey by Melissa Acevado. (See Not. Pursuant to CPL 710.30(1)(b) (Am. Compl., Ex. C (Dkt. 16-1)) at ECF p. 19.) The basis for the lineup or the use of the lineup's results are unclear from the record.

During the following days, ACS continued to investigate the assault of A.F. (Investigation Progress Notes at ECF p. 37-47; Not. of Am. Compl. ¶¶ 2-8.) On June 6, 2012, ACS met with G.T. at school; G.T. recanted her June 1, 2012, statement. (Investigation Progress Notes at ECF p. 41.) Instead, G.T. stated that Slater hit A.F. with a belt on May 24, 2012. (Id.) ACS also received records from the child protective services agencies in Florida and Texas; the records indicated that Slater had a history with each agency. (Id. at ECF p. 44 (case history in Fort Myers, Florida); id. at ECF p. 47 (twelve cases in Florida); id. at 47 (cases in Harris County, Texas).)

### 3. Petitions of Child Neglect are Brought Against Slater

On June 12, 2012, ACS called Slater multiple times, without reaching her. (Am. Compl. at ECF pp. 12-13.) When Slater returned the calls, ACS did not answer. (Id. at ECF p. 13.) On June 13, 2012, ACS brought three substantively identical Petitions of Neglect against Slater, one for each child. (Id.; see also Neglect Pets. (Am. Compl., Ex. I (Dkt. 16-1)) at ECF pp. 59-80.) Each Neglect Petition alleged that Slater's children should be removed from the home. (Neglect Pets. at ECF pp. 59-80.) Each Neglect Petition alleged that: (1) Slater threatened the child's

safety because she engaged in excessive corporal punishment, specifically, the May 24, 2012, assault of A.F., and (2) Slater suffers from a mental illness, which impairs her ability to care for her children. (Id.) Slater claims that "Defendants had no reason to file Petitions against Plaintiff other than the fact that they were mad at Plaintiff." (Am. Compl. at ECF p. 13.) To date, the removal proceedings are ongoing.

### B. Procedural History

On August 28, 2012, Slater filed her Complaint. (See Compl. (Dkt. 1).) On October 18, 2013, Slater filed the Amended Complaint. (See Am. Compl.; see also Not. of Am. Compl.) Broadly construed, the Amended Complaint alleges the following claims against the Police Defendants, the NYPD, the 63rd Precinct, and the City: (1) false arrest (Am. Compl. at ECF pp. 3-7); (2) excessive force (id.); (3) false imprisonment (id. at ECF pp. 7-9); and (4) malicious prosecution concerning the criminal charges (id. at ECF pp. 9-10); the following claims against McDonald and ACS: (1) malicious prosecution concerning the Neglect Petitions (id. at ECF pp. 10-13); (2) false allegations of drug abuse (id. at ECF p. 14); (3) false allegations of having bipolar and schizophrenia (id. at ECF pp. 14-15); and (4) fraud upon the court (id. at ECF pp. 15-16); the following claims against all Defendants: (1) intentional infliction of emotional distress (id. at ECF p. 16); (2) defamation (id. at ECF pp. 16-17); and (3) malicious abuse of process (id. at ECF pp. 17-18); and the following claims against ACS alone: (1) exposure of a minor to environmental toxins (id. at ECF pp. 18-19); and (2) subjecting a minor to a website that promotes nudity (id. at ECF p. 19).

On October 3, 2014, Defendants filed a motion to dismiss all of the claims alleged in the Amended Complaint. (Not. of Mot. to Dismiss.)

## III.   LEGAL STANDARDS

### A.   Summary Judgment

Summary judgment must be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A fact is material if it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). No genuine dispute of material fact exists if "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). In evaluating a motion for summary judgment, the court "is required to construe the evidence in the light most favorable to the non-moving party and to draw all reasonable inferences in its favor." Trammell v. Keane, 338 F.3d 155, 161 (2d Cir. 2003); see also Anderson, 477 U.S. at 255 ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.").

The moving party bears the initial burden to show an absence of genuine factual dispute. See Adickes v. S. H. Kress & Co., 398 U.S. 144, 157 (1970). Summary judgment will be granted if the opposing party then "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). To defeat summary judgment, the opposing party must do more than demonstrate "some metaphysical doubt as to the material facts," Matsushita, 475 U.S. at 586, and may not rely on "conclusory allegations." Twin Labs., Inc. v. Weider Health & Fitness, 900 F.2d 566, 568 (2d Cir. 1990). Where the party opposing summary judgment is proceeding pro se, the court must construe its filings liberally. See Ferran v. Town of Nassau, 471 F.3d 363, 369 (2d Cir. 2006).

**B.    42 U.S.C. § 1983**

Slater purports to bring all of her claims under 42 U.S.C. § 1983.[3] "Section 1983

provides a civil claim for damages against any person who, acting under color of state law,

deprives another of a right, privilege or immunity secured by the Constitution or the laws of the

United States." Sykes v. James, 13 F.3d 515, 519 (2d Cir. 1993). A claim under § 1983

therefore has two "essential elements." See Bailey v. City of New York, 79 F. Supp. 3d 424, 440

(E.D.N.Y. 2015) (describing the proper inquiry for evaluating claims under § 1983). First, "[t]he

conduct at issue 'must have been committed by a person acting under color of state law.'"

Cornejo v. Bell, 592 F.3d 121, 127 (2d Cir. 2010) (quoting Pitchell v. Callan, 13 F.3d 545, 547

(2d Cir. 1994)). Second, "[t]he conduct at issue . . . 'must have deprived a person of rights,

privileges, or immunities secured by the Constitution or laws of the United States.'" Id. (quoting

Pitchell, 13 F.3d at 547).

Accordingly, "Section 1983 itself creates no substantive rights; it provides only a

procedure for redress for the deprivation of rights established elsewhere." Thomas v. Roach, 165

F.3d 137, 142 (2d Cir. 1999); see also Hansel v. Brazell, 85 F. App'x 237, 238 (2d Cir. 2004)

(summary order). That is, in order to succeed on a claim under § 1983, a plaintiff must not only

show that her rights were violated, but also that the rights which were violated were rights

protected by the Constitution or federal law.

**C.    Municipal Liability under § 1983**

"Local governing bodies . . . can be sued directly under § 1983 for monetary,

declaratory, or injunctive relief where . . . the action that is alleged to be unconstitutional

implements or executes a policy statement, ordinance, regulation, or decision officially adopted

---

[3] As explained below, many of Slater's claims are not actionable under § 1983. Where Slater's claim could nonetheless be actionable under state law and the court's exercise of supplemental jurisdiction, the court examines the viability of the claim as such.

10

and promulgated by that body's officers." See Monell v. Dep't of Soc. Servs., 436 U.S. 658, 690 (1978). However, a "municipality cannot be held liable solely because it employs a tortfeasor." Id.

Consequently, a municipality may be held liable under 42 U.S.C. § 1983 only if the constitutional violation at issue results from the municipality's official policy. See id. at 694. Such a policy may be (1) an express policy, (2) "a widespread practice that, although not authorized by written law or express municipal policy, is 'so permanent and well settled as to constitute a "custom or usage" with the force of law,'" City of St. Louis v. Praprotnik, 485 U.S. 112, 127 (1988) (quoting Adickes v. S.H. Kress & Co., 398 U.S. 144, 167-68 (1970)), or (3) a decision by a person with "final policymaking authority," see Praprotnik, 485 U.S. at 123; Pembaur v. City of Cincinnati, 475 U.S. 469 (1986). Importantly, the official policy must cause the plaintiff's injury. Wray v. City of New York, 490 F.2d 189, 195 (2d Cir. 2007).

### D.    Qualified Immunity

Qualified immunity shields government officials from civil damages liability "as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." Anderson v. Creighton, 483 U.S. 635, 638 (1987). "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." Pearson v. Callahan, 555 U.S. 223, 231 (2009).

Individual government actors performing discretionary tasks are entitled to qualified immunity if: "(a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law."

Wilkinson ex rel. Wilkinson v. Russell, 182 F.3d 89, 103 (2d Cir. 1999) (quoting Tierney v. Davidson, 133 F.3d 189, 196 (2d Cir. 1998)).

"[T]he entitlement is an immunity from suit rather than a mere defense to liability." Hunter v. Bryant, 502 U.S. 224, 227 (1991) (per curium) (quoting Mitchell v. Forsyth, 472 U.S. 511, 526 (1985)). Accordingly, questions of qualified immunity should be resolved "at the earliest possible stage in litigation," id., and qualified immunity is often properly resolved on a motion for summary judgment, see, e.g., Pines v. Bailey, 563 F. App'x 814, 818 (2d Cir. 2014) (summary order).

### E. False Arrest and False Imprisonment

"In New York, the tort of false arrest is synonymous with that of false imprisonment." Posr v. Doherty, 944 F.2d 91, 96 (2d Cir. 1991). False arrest and false imprisonment claims stem from the Fourth Amendment right to be free from unreasonable searches and seizures, which includes the right to be free from arrest absent probable cause.[4] See Jaegly v. Couch, 439 F.3d 149, 151 (2d Cir. 2006). Accordingly, the existence of probable cause is an absolute defense to a false arrest claim. Id. at 152; Weyant v. Okst, 101 F.3d 845, 852 (2d Cir. 1996). It is a defendant's burden to establish the existence of probable cause. See Dickerson v. Napolitano, 604 F.3d 732, 751 (2d Cir. 2010) ("When an arrest is not made pursuant to a judicial warrant, the defendant in a false arrest case bears the burden of proving probable cause as an affirmative defense." (quoting Broughton v. State, 335 N.E.2d 310, 315 (N.Y. 1975))); Jenkins v. City of New York, 478 F. 3d 76, 88 (2d Cir. 2007) (explaining that under New York law, an

---

[4] A false arrest claim under § 1983 is substantially similar to a claim for false arrest under New York law. See Weyant v. Okst, 101 F.3d 845, 852 (2d Cir. 1996). Under New York law, to prove the elements of false arrest, a plaintiff must show: "(1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged." Bernard v. United States, 25 F.3d 98, 102 (2d Cir. 1994).

arrest made without a warrant is presumed unlawful unless the officer can prove the existence of probable cause).

Probable cause exists when, based on the totality of the circumstances, the arresting officer has "knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." Weyant, 101 F. 3d at 852; see also Dunaway v. New York, 442 U.S. 200, 208 n.9 (1979); Escalera v. Lunn, 361 F.3d 737, 743 (2d Cir. 2004). Determining whether probable cause exists requires an objective assessment of the facts known to the officer at the time of arrest.[5] See Devenpeck v. Alford, 543 U.S. 146, 152-53 (2004); Finigan v. Marshall, 574 F.3d 57, 61-62 (2d Cir. 2009). Accordingly, "[s]ubjective intentions" of the arresting officer "play no role in ordinary, probable cause Fourth Amendment analysis." Whren v. United States, 517 U.S. 806, 813 (1996); see also United States v. $577,933.89, More or Less, in U.S. Funds, 287 F.3d 66, 85 (2d Cir. 2002) ("[T]he determination of probable cause is an objective one, to be made without regard to the individual officer's subjective motives . . . .").

When an officer receives his information from a putative victim or eyewitness, probable cause is established "unless the circumstances raise doubt as to the person's veracity." Fabrikant v. French, 691 F.3d 193, 216 (2d Cir. 2012) (quoting Panetta v. Crowley, 460 F.3d 388, 395 (2d Cir. 2006)). "The most common situation in which doubts arise is when there exists a prior relationship between the victim and the accused that gives rise to a motive for a false accusation." DiStefano v. Sedita, No. 11-CV-1125 (MKB), 2014 WL 349251, at *4 (E.D.N.Y. Jan. 31, 2014) (quoting Mistretta v. Prokesch, 5 F. Supp. 2d 128, 133 (E.D.N.Y. 1998)); see also

---

[5] Pursuant to the collective knowledge doctrine, facts known to one member of a law enforcement team cooperating in an investigation are presumed to be shared by the others when determining the existence of probable cause to arrest. See Savino v. City of New York, 331 F.3d 63, 74 (2d Cir. 2003).

Hart v. City of New York, No. 11-CV-4678 (RA), 2013 WL 6139648, at *5 (S.D.N.Y. Oct. 28, 2013) ("[W]here a bitter prior relationship exists that is known to the arresting officer before the arrest is made, a complaint from the complaining victim alone may not be enough to constitute probable cause; the officer may need to investigate further." (internal quotation marks and citation omitted)).  When there is reason to doubt the truthfulness of a complaint, the officer is required to investigate further and acquire additional information that corroborates the putative victim's statement.  See DiStefano, 2014 WL 349251, at *5; Hart, 2013 WL 6139648, at *5; Williams v. City of New York, No. 02-CV-3693 (CBM), 2003 WL 22434151, at *5 (S.D.N.Y. Oct. 23, 2003).

Finally, "a claim for false arrest turns only on whether probable cause existed to arrest a defendant, and . . . it is not relevant whether probable cause existed with respect to each individual charge, or, indeed, any charge actually invoked by the arresting officer at the time of arrest." Jaegly v. Couch, 439 F.3d 149, 153 (2d Cir. 2006).

**F.      Excessive Force**

A claim that law enforcement officers used excessive force in the course of an arrest is analyzed under the Fourth Amendment's reasonableness standard.  See Graham v. Connor, 490 U.S. 386, 395 (1989).  Under this standard, the determinative question is whether the officers' actions were "'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." Id. at 397.  Reasonableness is judged "from the perspective of a reasonable officer on the scene," and "'[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers,' violates the Fourth Amendment." Id. at 396 (quoting Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir. 1973)).  The court considers the totality of the circumstances, "including the severity of the crime at issue,

whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Id. (citing Tennessee v. Garner, 471 U.S. 1, 8-9 (1985)).

## G.  Malicious Prosecution

To succeed on a claim of malicious prosecution under New York or federal law, a plaintiff must show that: (1) the defendant initiated a prosecution against the plaintiff; (2) the defendant lacked probable cause to believe the proceeding could succeed; (3) the defendant acted with malice; and (4) the prosecution terminated in the plaintiff's favor. See Rohman v. N.Y.C. Transit Auth., 215 F.3d 208, 215 (2d Cir. 2000). A federal malicious prosecution claim also requires that the plaintiff demonstrate a sufficient post-arraignment liberty restraint to implicate his Fourth Amendment rights. Singer v. Fulton Cnty. Sheriff, 63 F.3d 110, 117 (2d Cir. 1995). Unlike with false arrest, malicious prosecution claims are analyzed with respect to the specific crime charged. See, e.g., Janetka v. Dabe, 892 F.2d 187, 190-91 (2d Cir. 1989); Bennett v. N.Y. Police Dep't, No. 12-CV-1345 (KBF), 2013 WL 840611, at *4 (S.D.N.Y. Mar. 1, 2013).

"Once probable cause to arrest has been established, claims of malicious prosecution survive only if, between the arrest and the initiation of the prosecution, 'the groundless nature of the charges [is] made apparent by the discovery of some intervening fact.'" Smith v. Tobon, 529 F. App'x 36, 38 (2d Cir. 2013) (summary order) (quoting Lowth v. Town of Cheektowaga, 82 F.3d 563, 571 (2d Cir. 1996)). "In addition, where the alleged malicious prosecution was a civil action, [the plaintiff] must also demonstrate a 'special injury,' i.e., 'some interference with [the] plaintiff's person or property . . . beyond the ordinary burden of defending a lawsuit." McCaul v. Ardsley Union Free Sch. Dist., 514 F. App'x 1, 6 (2d Cir. 2013) (summary order) (alteration in original) (quoting Engel v. CBS, Inc., 145 F.3d 499, 502 (2d Cir. 1998)).

## H.    False Allegations

False allegations by government officials, particularly in relation to court proceedings, are actionable in a number of ways, including as due process claims, defamation "stigma plus" claims, and state law claims.  It is not completely clear which theories Slater is pursuing and which Defendants are defending against.  Nonetheless, the court—mindful of its role in assessing pro se complaints—attempts to articulate and address each plausible theory.

First, it is "clearly established that it violates due process under the Fourteenth Amendment for a government official to give false testimony in a state court proceeding."  Velez v. Reynolds, 325 F. Supp. 2d 293, 316 (S.D.N.Y. 2004).

Second, a claim for government defamation may be actionable under § 1983, but only if a plaintiff alleges "stigma plus."  "To prevail on a stigma plus claim, a plaintiff must show (1) the utterance of a statement sufficiently derogatory to injure his or her reputation, that is capable of being proved false, and that he or she claims is false, and (2) a material state-imposed burden or state-imposed alteration of the plaintiff's status or rights."  Sadallah v. City of Utica, 383 F.3d 34, 38 (2d Cir. 2008) (internal quotation marks and citation omitted).

Additionally, state tort law protects plaintiffs from false statements.  In New York, to prove libel, a plaintiff must show "(1) a written defamatory factual statement concerning the plaintiff; (2) publication to a third party; (3) fault; (4) falsity of the defamatory statement; and (5) special damages or per se actionability."  Chau v. Lewis, 771 F.3d 118, 126-27 (2d Cir. 2014).  Similarly, the elements of slander are "(i) a defamatory statement of fact, (ii) that is false, (iii) published to a third party, (iv) of and concerning the plaintiff, (v) made with the applicable level of fault on the part of the speaker, (vi) either causing special harm or constituting slander per se, and (vii) not protected by privilege."  Sleepy's LLC v. Select Comfort Wholesale Corp., No. 07-

CV-4018 (JS) (ARL), 2015 WL 5599145, at *11 (E.D.N.Y. Sept. 22, 2015) (internal quotation marks and citation omitted).

## I.    Intentional Infliction of Emotional Distress

Slater attempts to bring her intentional infliction of emotional distress claim under § 1983. As explained above, § 1983 only allows a plaintiff to challenge the deprivation of a federal right. See supra Part III.B. Courts have been careful to ensure that § 1983 does not become a vehicle to federalize all torts committed by state actors. See Paul v. Davis, 424 U.S. 693, 700-01 (1976) (rejecting a reading of § 1983 that "would make of the Fourteenth Amendment a font of tort law to be superimposed upon whatever systems may already be administered by the States").

A claim for intentional infliction of emotional distress does not implicate a federal right, rather it is a state law tort claim. In New York "[t]he state law tort of intentional infliction of emotional distress has four elements: (1) extreme and outrageous conduct, (2) intent to cause severe emotional distress, (3) a causal connection between the conduct and the injury, and (4) severe emotional distress." Bender v. City of New York, 78 F.3d 787, 790 (2d Cir. 1996). "Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." Stuto v. Fleishman, 164 F.3d 820, 827 (2d Cir. 1999) (internal quotation marks and citations omitted).

## J.    Malicious Abuse of Process

Under either New York or federal law, "a malicious abuse of process claim lies against a defendant who (1) employs regularly issued legal process to compel performance or forbearance of some act (2) with intent to do harm without excuse or justification, and (3) in order to obtain a

collateral objective that is outside the legitimate ends of the process." Cook v. Sheldon, 41 F.3d 73, 80 (2d Cir. 1994). "[T]o state a claim for abuse of criminal process, it is not sufficient for a plaintiff to allege that the defendants were seeking to retaliate against him by pursuing his arrest and prosecution. Instead, he must claim that they aimed to achieve a collateral purpose beyond or in addition to his criminal prosecution." Savino v. City of New York, 331 F.3d 63, 77 (2d Cir. 2003). "In other words, the proper use of legal process based on an improper or malicious motive such as a desire for retaliation is insufficient to satisfy the 'collateral objective' requirement." Pinter v. City of New York, 976 F. Supp. 2d 539, 568 (S.D.N.Y. 2013). "A malicious abuse of process claim thus requires an ulterior purpose such as the infliction of economic harm, extortion, blackmail, or retribution." Hoyos v. City of New York, 999 F. Supp. 2d 375, 391 (E.D.N.Y. 2013).

"[T]he gist of abuse of process is the improper use of process after it is regularly issued." Cook, 41 F.3d at 80. Accordingly, to succeed on an abuse of process claim, a plaintiff must not only show a collateral objective, but must show that that objective was pursued after legal process was issued. Richardson v. N.Y.C. Health & Hosps. Corp., No. 05-CV-6278 (RJS), 2009 WL 804096, at *16-17 (S.D.N.Y. Mar. 25, 2009).

"Finally, while the law is not entirely settled on this point, the weight of authority holds that the presence of probable cause negates a claim for abuse of criminal process." Pinter, 976 F. Supp. 2d at 568-69 (collecting cases).

**K.      Exposure of a Minor to Toxins and Websites**

"[C]hildren in foster care [have] a substantive due process right [under the Fourteenth Amendment] to protection from harm." Green ex rel. T.C. v. Mattingly, No. 07-CV-1790 (ENV) (CLP), 2010 WL 3824119, at *13 (E.D.N.Y. Sept. 23, 2010) (quoting Tylena M. v. Heartshare

Children's Servs., 390 F. Supp. 2d 296, 302 (S.D.N.Y. 2005)). "When an official is charged with default in exercise of the above affirmative responsibility, there are two fundamental requisites for [§] 1983 liability to be imposed. The first is that the omissions must have been a substantial factor leading to the denial of a constitutionally protected liberty or property interest. The second is that the officials in charge of the agency being sued must have displayed a mental state of deliberate indifference in order to meaningfully be termed culpable." Doe v. N.Y.C. Dep't of Soc. Servs., 649 F.2d 134, 141 (2d Cir. 1981); see also Phillips ex rel. Green v. City of New York, 453 F. Supp. 2d 690, 721 (S.D.N.Y. 2006). "Deliberate indifference' encompasses an official 'know[ing] of and disregard[ing] an excessive risk' to a child's 'health or safety.'" Green, 2010 WL 3824119, at *13 (quoting Phillips, 452 F. Supp. 2d at 722-23).

## IV. DISCUSSION

### A. Municipal Liability

Slater attempts to show that her rights were violated because of a governmental policy. She claims that "[t]he Defendants have testified under oath in open court that they committed actions due to their governmental policy." (Am. Compl. at ECF p. 3.) She then directs the court to the transcript of a June 25, 2012, family court hearing. (Id.; see also June 25, 2012, Tr. (Am. Compl., Ex. A (Dkt. 16-1)) at ECF p. 2.) As Defendants correctly note, all the transcript shows is that McDonald did not seek to remove Slater's children earlier because of a governmental policy that required a safety conference prior to instituting removal proceedings:

> Q: And you didn't come to the Family Court at that time on June 3, to file any papers regarding the status of those two children, right?
>
> A: No, because the procedure is that we have a Child Safety Conference and then the results of the Child Safety Conference then would determine whether we'd go to court or not.

(June 25, 2012, Tr. at 73:15-21.) Slater does not explain how the policy of having a child safety conference prior to instituting a Neglect Petition caused any of her (or her children's) purported constitutional injuries. Indeed, it defies logic to believe that the City's policy of delaying a removal petition until a child safety conference can be held in any way contributed to Slater's purported injuries. To the contrary, the procedure that Slater complains of is intended to protect parents by delaying removal petitions. Absent proof of a causal connection between a City policy and Slater's alleged injuries, Slater's municipal liability claim fails.

In her opposition brief, Slater attempts to revive her claim of municipal liability by alleging that the City failed properly to train the Police Defendants. (Pl.'s Mem. at 11, 19.) This claim is wholly lacking in support. Slater does not identify any deficiency in training or any facts that would link a purported training failure to her purported deprivation of rights. Absent such allegations, and some proof thereof, Slater's claim fails. See Amnesty Am. v. Town of W. Hartford, 361 F.3d 113, 129 (2d Cir. 2004) (Sotomayor, J.) (dismissing a claim of municipal liability where the plaintiffs "neglected to offer any evidence . . . as to the purported inadequacies in the Town's training program and the causal relationship between those inadequacies and the alleged constitutional violations").[6] Accordingly, Defendants' motion for summary judgment is GRANTED with regard to Slater's municipal liability claim.

### B.     False Arrest and False Imprisonment

Slater alleges that she was falsely arrested and imprisoned on a charge of robbery. (Am. Compl. at ECF p. 5.) Defendants respond that "Detective Mackey had probable cause to arrest

---

[6] Slater attempts to sue not only the City, but also the NYPD, ACS, and the 63rd Precinct. Each is a non-suable entity. See Jenkins v. City of New York, 478 F.3d 76, 93 n.19 (2d Cir. 2007) (NYPD is a non-suable entity); Worrell v. City of New York, No. 12-CV-6151 (MKB), 2014 WL 1224257, at *3 (E.D.N.Y. Mar. 24, 2014) ("ACS is not a suable entity."); Simmons v. 52nd Precinct, No. 12-CV-4395 (JGK), 2012 WL 2304261, at *1 (S.D.N.Y. June 18, 2012) (Plaintiff's claims against the 52nd Precinct of the New York City Police Department must be dismissed because an agency of the City of New York is not an entity that can be sued."). Accordingly, Defendants are granted summary judgment on all the claims against the NYPD, ACS, and the 63rd Precinct.

Plaintiff for assaulting A.F." (Defs.' Mem. at 11), and that because Detective Mackey had probable cause to arrest, the fact that Slater may have been wrongly charged with a robbery is irrelevant (id. at 10).

The court concludes that the Police Defendants had probable cause to arrest Slater as a matter of law. Prior to the arrest, the Police Defendants interviewed A.F. and observed her injuries. A.F. stated that Slater had assaulted her, resulting in a black eye and bruising on her arms and legs. This allegation corresponded with the injuries that the Police Defendants observed. A statement by the victim along with corroborating evidence was more than enough to give the Police Defendants probable cause to arrest Slater "unless the circumstances raise doubt as to the [victim's] veracity." Fabrikant v. French, 691 F.3d 193, 216 (2d Cir. 2012) (quoting Panetta v. Crowley, 460 F.3d 388, 395 (2d Cir. 2006)). Slater does not allege that the Police Defendants were or should have been on notice of facts that should have required them to further investigate A.F.'s allegations. Accordingly, the Police Defendants had probable cause to arrest Slater for assaulting A.F. See, e.g., Martinez v. Simonetti, 202 F.3d 625, 634 (2d Cir. 2000) ("We have previously held that police officers, when making a probable cause determination, are entitled to rely on the victims' allegations that a crime has been committed."); Curley v. Village of Suffern, 268 F.3d 65, 70 (2d Cir. 2001) ("When information is received from a putative victim or an eyewitness, probable cause exists."); Singer v. Fulton Cnty. Sheriff, 63 F.3d 110, 119 (2d Cir. 1995) ("An arresting officer advised of a crime by a person who claims to be the victim, and who has signed a complaint or information charging someone with the crime, has probable cause to effect an arrest absent circumstances that raise doubts as to the victim's veracity."); Pearson v. Lorancaitis, No. 09-CV 1641 (VLB), 2012 WL 162355, at *7 (D. Conn. Jan. 19, 2012) ("Typically, a 'police officer may rely upon the statements of victims or witnesses

21

to determine the existence of probable cause for the arrest, regardless of the ultimate accurateness or truthfulness of the statements.'" (quoting Bourguignon v. Guinta, 247 F. Supp. 2d 189, 193 (D. Conn. 2003))).

Slater nonetheless claims that she was arrested not for the A.F. Assault Charges, but for a robbery, and further that there was no probable cause to support a robbery charge. (Am. Compl. at ECF p. 5.) This argument misses the mark.

First, Slater's contention that she was arrested solely on a robbery charge is belied by the record. Slater has adduced no evidence that raises a genuine issue of material fact that she was not arrested on the A.F. Assault Charges. Instead, the documents that Slater has annexed to the Amended Complaint only show that she was indicted for both robbery and the A.F. Assault Charges. (Webcrims Case Details – Charges at ECF p. 14.) Indeed, the incident date listed to justify Slater's arrest is May 24, 2012, the date of the alleged assault of A.F. (Id.) Slater herself appears to acknowledge that she was arrested in connection with the investigation into the assault of A.F. (Not. of Am. Compl. ¶ 1 ("Plaintiff was arrested on June 1st, 2012 as a result of the visit [describing ACS and NYPD investigation into the assault of A.F.]"). Additionally, the relative timing of the arrest and the lineup (which Slater alleges underlies the robbery charge) do not support Slater's contention that she was arrested for robbery. Slater was arrested at 5:35 p.m. on June 1, 2014.[7] (Webcrims Case Details – Summary at ECF p. 15.) It was not until 6:15 p.m. that Slater was identified in a lineup. (Not. Pursuant to CPL 710.30(1)(b) at ECF p. 19; Am. Compl.

---

[7] The court recognizes that '[t]here is no bright line rule differentiating an arrest from a detention supportable by less than probable cause.' Vanderwoude v. City of New York, No. 12-CV-9046 (KPF), 2014 WL 2592457, at *10 (S.D.N.Y. June 10, 2014) (quoting Posr v. Doherty, 944 F.2d 91, 98 (2d Cir. 1991)). And that accordingly, the time that the State formally makes an arrest may not correspond to the actual time that an arrest legally occurred. Here however, the evidence indicates that Slater was actually arrested at 5:35 p.m. First, Slater herself alleges that she was arrested at the precinct. (Am. Compl. at ECF p. 4 ("When Plaintiff arrived to the precint [sic] and after the Defendants spoke with Plaintiff's children and the Plaintiff, Plaintiff was arrested and taken to jail.").) Second, Slater notes that while still at her home she was threatened with arrest, as opposed to actually arrested. (Id.) Finally, Slater acknowledges that she was arrested following the interviews of herself and her children (id.), and those interviews occurred at the precinct (Investigation Progress Notes at ECF p. 32).

at ECF p. 7 ("The identified eyewitness allegedly pointed out Plaintiff at the 63rd Precinct [sic], where the Plaintiff was being held in a holding cell at the time.").) Slater alleges that the lineup procedure formed the basis of the robbery charge. (Am. Compl. at ECF p. 5.) However, the lineup occurred after Slater's arrest, indicating that robbery was not the arrest charge.

More fundamental, even if Slater was arrested on the robbery charge, her claim would nonetheless fail. "[T]he 'subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause.'" Jaegly v. Couch, 439 F.3d 149, 153 (2d Cir. 2006) (quoting Devenpeck v. Alford, 543 U.S. 146, 153 (2004)). Accordingly, "a claim for false arrest turns only on whether probable cause existed to arrest a defendant, and . . . it is not relevant whether probable cause existed with respect to each individual charge, or, indeed, any charge actually invoked by the arresting officer at the time of arrest." Id. Slater has failed to show that there is a genuine issue of material fact regarding whether the Defendants had probable cause to arrest for the assault of A.F. Accordingly, the Police Defendants had probable cause to arrest Slater and there is no genuine issue of material fact regarding Slater's false arrest and false imprisonment claims. Defendants' motion for summary judgment is GRANTED with regard to Slater's false arrest and false imprisonment claims.

### C.     Excessive Force

Slater alleges that "[i]t is clear how the Officers exerted force against the Plaintiff." (Am. Compl. at ECF p. 4.) It is not. Indeed, Slater neither alleges nor adduces evidence that any Defendant actually used force against her. Rather, the Amended Complaint only alleges that Detective Young "was screaming in Plaintiff's face acting as if he was going to hit her" and that he "blocked Plaintiff by putting his arm across the doorway" to her home. (Am. Compl. at ECF p. 4.) Defendants argue that the claim fails because "Plaintiff does not allege that either

23

Detective Mackey or Detective Young ever made physical contact with her. The claim would fail." (Defs.' Mem. at 7-8 n.7.) Defendants are correct.

"A threat of force does not constitute excessive force." <u>Dunkelberger v. Dunkelberger</u>, No. 14-CV-3877 (KMK), 2015 WL 5730605, at *15 (S.D.N.Y. Sept. 30, 2015) (collecting cases); <u>Murphy v. Pizarrio</u>, No. 94-CV-0471 (JFK), 1995 WL 565990, at *3 (S.D.N.Y. Sept. 22, 1995) ("[M]ere threatening language and gestures of a custodial officer do not, even if true, amount to constitutional violations." (citation omitted)). Accordingly, Slater cannot prevail on a claim of excessive force.

Moreover, even if a threat of force could conceivably underlie an excessive force claim, "[b]ecause of the considerable uncertainty revealed in the case law cited above, this Court cannot find that [Defendants'] alleged threats . . . constitute the violation of a clearly established constitutional right." <u>Snoussi v. Bivona</u>, No. 05-CV-3133 (RJD) (LB), 2008 WL 3992157, at *6 (E.D.N.Y. Aug. 22, 2008); <u>see also</u> <u>Pelt v. City of New York</u>, No. 11-CV-5633 (KAM) (CLP), 2013 WL 4647500, at *14 (E.D.N.Y. Aug. 28, 2013) (citing <u>Snoussi</u> and finding that even if a threat of force claim were cognizable, defendants would be entitled to qualified immunity on such a claim). Accordingly, even if an excessive force claim could be premised on threats of force alone, Slater's claim would still fail because the Police Defendants would be entitled to qualified immunity on such a claim. Accordingly Defendants' motion for summary judgment is GRANTED with regard to Slater's excessive force claim.

### D.    Malicious Prosecution: Slater's Criminal Charges

As explained above, the Police Defendants had probable cause to arrest Slater for the A.F. Assault Charges. <u>See</u> <u>supra</u> Part IV.B. Slater has not adduced evidence to suggest that between her arrest and the prosecution of the assault, the prosecution discovered new evidence

that would have made the groundless nature of the charges apparent. Indeed, following the arrest, the prosecution discovered additional evidence that supported the A.F. Assault Charges. For example, hours after the arrest, the police interviewed T.F., who largely confirmed A.F.'s account of the assault. Moreover, although G.T. initially told the NYPD and ACS that A.F. had not been assaulted, she later recanted and substantially corroborated A.F.'s account of the assault. Accordingly, Slater cannot raise a genuine issue of material fact with regard to her claim that the A.F. Assault Charges were maliciously prosecuted. See Smith v. Tobon, 529 F. App'x 36, 38 (2d Cir. 2013) (summary order).

Slater appears to raise an additional claim, namely that she was maliciously prosecuted for robbery without probable cause. She argues that "[t]he Police Officers were not under the impression that the Plaintiff committed a robbery, but arrested her, fingerprinted her, had her identified, and processed the paperwork in accusation that the Plaintiff committed robbery." (Pl.'s Mem. at 10.) That is—interpreting her claims as charitably as possible—Slater alleges that even if the Police Defendants may have had probable cause to arrest and charge her with the A.F. Assault Charges, they had no basis to subject her to a lineup and later charged with robbery.

This claim fails as a matter of pleading because the Amended Complaint "does not assert in even a cursory manner that the lineups were carried out without probable cause, a necessary allegation without which claims for false arrest or malicious prosecution must fail." Scretching v. Schlosser, No. 12-CV-8129 (PAE) (JLC), 2014 WL 1797687, at *6 (S.D.N.Y. May 6, 2014) (report and recommendation), adopted, 2014 WL 2624754 (S.D.N.Y. June 4, 2014). Instead, Slater states that the robbery charge was unsupported because (1) she was charged with committing a robbery at her parents' residence, and (2) she does not know the name of the identifying witness. (Am. Compl. at ECF p. 5.) Slater does not allege when, or even if,

25

Defendants ever learned of these purported flaws in the robbery charge. Nonetheless, Slater may be able to state a claim for malicious prosecution for robbery if she can allege either that the police lacked probable cause to conduct a lineup in the first place, or that Defendants learned of highly exculpatory evidence and proceeded nonetheless. Accordingly, Slater's malicious prosecution claim related to the robbery is DISMISSED WITHOUT PREJUDICE for failure to state a claim.[8]

### E.    Malicious Prosecution: Neglect Petitions

Slater alleges that McDonald and ACS maliciously brought neglect petitions against her in retaliation for her not answering their phone calls. (Am. Compl. at ECF pp. 11-13.) As an initial matter, Slater cannot succeed on her malicious prosecution claim concerning the Neglect Petitions because the actions have not been terminated in her favor. At present, Slater appears to be appealing an adverse ruling by the Family Court. (Family Court Appeal (Pl.'s Memo, Ex. 1 (Dkt. 31-1)).) "Accordingly, plaintiff has failed to allege that the Family Court proceeding was terminated in her favor, and thus plaintiff has failed to state a claim for malicious prosecution." Green v. Mattingly, 585 F.3d 97, 104 (2d Cir. 2009).

In any event, McDonald had probable cause to initiate Neglect Petitions against Slater. A finding of probable cause will negate a claim of malicious prosecution premised on a Neglect Petition. Yuan v. Rivera, 48 F. Supp. 2d 335, 349 (S.D.N.Y. 1999). The Neglect Petitions charged Slater with neglect under section 1012 of the New York Family Court Act. (Neglect Petitions at ECF p. 60.) The court finds that McDonald had probable cause to believe that the children were being neglected at the time that the Neglect Petitions were filed and prosecuted.

---

[8] Slater appears also to assert a malicious prosecution claim against the prosecutors and the judge in her criminal case. (Am. Compl. at ECF p. 9.) Those individuals were not was named or served in this action. Additionally, both the prosecutors and the judge would likely be protected by absolute immunity. Buckley v. Fitzsimmons, 509 U.S. 259, 273, 277 (1993).

Section 1012 defines "[n]eglected child" to include "a child less than eighteen years of age . . . whose physical, mental or emotional condition has been impaired or is in imminent danger of becoming impaired as a result of the failure of his parent or other person legally responsible for his care to exercise a minimum degree of care . . . in providing the child with proper supervision or guardianship, by unreasonably inflicting or allowing to be inflicted harm, or a substantial risk thereof, including the infliction of excessive corporal punishment . . . ." N.Y. Fam. Ct. Act § 1012(f)(i)(B). At the time that McDonald filed the Neglect Petitions, she had probable cause to believe that Slater had engaged in excessive corporal punishment. Namely, by June 13, all three of Slater's children had reported that Slater assaulted A.F. and ACS had learned of Slater's extensive history of child protective services cases in Florida and Texas. Based on these facts, a reasonable jury would be compelled to find that McDonald had probable cause to initiate the Neglect Petitions. See, e.g., Mercedes ex rel. Brown v. Blue, No. 00-CV-9225 (RMB), 2004 WL 2202578, at *10 (S.D.N.Y. Sept. 30, 2004); Dietz v. Damas, 932 F. Supp. 431, 458 (E.D.N.Y. 1996). Accordingly, Defendants' motion for summary judgment is GRANTED with regard to Slater's malicious prosecution claim against McDonald.

**F.** **False Allegations of Drug Abuse and Bipolar Disorder, Defamation, and Fraud on the Court**

Slater's claims of false allegations of bipolar disorder, defamation, and fraud on the court all essentially assert the same theory—namely, that McDonald made false statements in the Neglect Petitions and in Family Court concerning Slater's mental health, A.F.'s injuries, and Slater's drug abuse,. (See Am. Compl. at ECF pp. 14, 16.)[9] The court reads these claims as

---

[9] "To the extent that plaintiff['s] claims encompass representations actually made by ACS's lawyer at the Family Court hearing, those representations cannot serve as the basis for § 1983 liability because the lawyer is entitled to absolute immunity. ACS caseworkers, on the other hand, are protected only by qualified immunity." Green ex rel. T.C. v. Mattingly, No. 07-CV-1790 (ENV) (CLP), 2010 WL 3824119, at *14 (E.D.N.Y. Sept. 23, 2010).

presenting a due process violation (either free standing or as a stigma plus claim)—namely, that because of ACS's false statements, Slater's children were removed.

The majority of Plaintiff's claim cannot succeed because McDonald is entitled to qualified immunity for all reasonable statements made during the family court proceedings.[10] "It is well settled that case workers are entitled to 'unusual deference' in connection with child abuse and neglect investigations." Shapiro v. Kronfeld, No. 00-CV-6286 (RWS), 2004 WL 2698889, at *15 (S.D.N.Y. Nov. 24, 2004) (quoting Wilkinson ex rel. Wilkinson v. Russell, 182 F.3d 89, 104-05 (2d Cir. 1999)). Indeed, "[t]he Second Circuit has held that 'sins of commission and omission in what [caseworkers] told and failed to tell [a] Family Court Judge' are insufficient to overcome the 'necessary freedom of action that qualified immunity accords caseworker defendants' dealing with evolving and dangerous domestic abuse situations." Walker v. City of New York, 63 F. Supp. 3d 301, 312 (E.D.N.Y. 2014) (quoting Cornejo v. Bell, 592 F.3d 121, 128 (2d Cir. 2010)). Nonetheless, "[i]t is axiomatic that a caseworker seeking the protection of qualified immunity cannot have utilized perjury and intentional fabrications during her investigation and in presenting a case to the Family Court." Id. "The question for the Court, then, is whether [the caseworker's] alleged misrepresentations were sufficiently material and serious to render the removal process constitutionally defective." Green ex rel. T.C. v. Mattingly, No. 07-CV-1790 (ENV) (CLP), 2010 WL 3824119, at *9 (E.D.N.Y. Sept. 23, 2010).

    1.    Mental Illness

Slater alleges that despite receiving the Florida mental health examination which indicated that Slater did not suffer from a mental illness (see Fla. Mental Health Examination

---

[10] The court notes that it is permitted to reach qualified immunity before deciding the merits of Slater's allegations. See Pearson v. Callahan, 555 U.S. 223, 227 (2009).

(Am. Compl., Ex. N (Dkt. 16-1)) at ECF p. 102), McDonald stated in the Neglect Petition that the Florida mental health examination indicated the opposite (Am. Compl. at ECF p. 13). If Slater's allegation is confined to this style of claim, it survives Defendants' motion. Indeed, at this stage, there is a genuine issue of material fact regarding precisely what documents McDonald received and precisely what formed the basis of the Neglect Petitions. The Neglect Petitions indicate that according to "records from the Florida Department of Children and Families the respondent mother has been diagnosed with bi-polar disorder and prescribed Zoloft and Trazodone and was supposed to be engaged in therapy. According to Florida records the respondent mother was hospitalized at Brookdale Hospital Psychiatric Center." (Neglect Pets. at ECF p. 71.) This statement is not an accurate summary of the mental health evaluation from Florida included in the current record before the court. (See Fla. Mental Health Evaluation). Perjury by government workers in state court is actionable under § 1983 and is not entitled to qualified immunity. Walker, 63 F. Supp. 3d at 312; Velez v. Reynolds, 325 F. Supp. 2d 293, 316 (S.D.N.Y. 2004). Accordingly, at this stage, Slater's claim—as confined to a misrepresentation claim about her mental health—must survive.

### 2. Photos of A.F.'s Bruising

Slater further claims that ACS and McDonald violated her due process rights by submitting into evidence false photographs of A.F.'s bruises. (Am. Compl. at ECF p.15 ("Plaintiff realized that the pictures that ACS had in evidence were pictures of old bruises that child A.F. had allegedly received in the year of 2011.").) Further, Slater alleges that she "informed the Court that she has pictures that she wants to submit into evidence." (Id.)

Slater's claim fails as a matter of pleading. Slater has neither alleged, nor produced evidence indicating, that ACS or McDonald knew or had reason to know that the photographs

that they submitted to the family court were false.[11]  Absent such allegations, Slater cannot show

that it was unreasonable for McDonald to rely on the purportedly false photographs; and

accordingly, Slater cannot state a claim.  See Tenenbaum v. Williams, 193 F.3d 581, 596

(2d Cir. 1999).  Consequently, Slater's fraud on the court claim related to photographs of A.F.'s

bruises is DISMISSED WITHOUT PREJUDICE.

### 3.    Substance Abuse

Slater also alleges that ACS and McDonald referred her to substance abuse treatment

without basis. (Am. Compl. at ECF p. 14.)  Notably, Slater does not allege that the referral was

made public, was mandatory, or resulted in any consequences if she failed to attend. (Id.; see

also Referral to Outpatient Treatment (Am. Compl., Ex. M (Dkt. 16-1)) at ECF pp. 98-99.)

Absent such allegations, Slater fails to state a claim.  First, Slater cannot state a claim of

defamation without alleging publicity.  See supra Part III.H.  Second, without alleging that

consequences flowed from the referral, Slater cannot plead a stigma plus claim.  (Id.)  Finally,

without alleging that she was forced to attend treatment, Slater cannot show a restriction on her

liberty.  Cf. Mills v. Rogers, 457 U.S. 291, 298-99 (1982) (explaining that there is a liberty

interest in avoiding mandatory administration of anti-psychotics).  Because Slater's substance

abuse claim fails as a matter of pleading, it is DISMISSED WITHOUT PREJUDICE.

### G.    Intentional Infliction of Emotional Distress

Slater alleges that Defendants intentionally inflicted emotional distress on her because

"ACS knew that it was wrong to remove Plaintiff's children when there was no reasons

documented to do so." (Am. Compl. at ECF p. 16.)  Namely, Slater claims "Plaintiff has

---

[11]  For the purposes of this motion, the court assumes that the photos were indeed inaccurate.

suffered emotional distress from having her children taken away from her without just cause and from not having lived with them for the last sixteen months." (Id.)

In order to prove intentional infliction of emotional dresses, "[t]he conduct which allegedly caused the emotional distress must be intentionally directed at the plaintiff without reasonable justification; a showing of gross negligence is insufficient." Callahan v. City of New York, 90 F. Supp. 3d 60, 76 (E.D.N.Y. 2015) (quoting Shapiro v. Kronfeld, No. 00-CV-6286 (RWS), 2004 WL 2698889, at *25 (S.D.N.Y. Nov. 24, 2004)). Slater's claim fails: "Plaintiff alleges that the Defendants committed the tort of intentional infliction of emotional distress merely by doing their jobs to report and investigate allegations of suspected child neglect, file neglect petitions . . . , and pursue the allegations of child neglect . . . until a disposition was reached. These actions are insufficient to support Plaintiff's allegation of intentional infliction of emotional distress by the Defendants." Id. (internal citations and quotation marks omitted). Consequently, Defendants' motion for summary judgment is GRANTED with regard to Slater's intentional infliction of emotional distress claim.

### H.     Malicious Abuse of Process

Slater alleges that "Defendants was [sic] angry at Plaintiff and thereby instituted actions intentionally." (Am Compl. at ECF p. 18.) She further claims that "[a]s a collateral objective an [sic] outside the legitimate ends of process, the Defendants wanted to exhibit to Plaintiff that she was in authority and that because of her position, she is allowed to break the law without being penalized. The objective was to have Plaintiff's children in her possession." (Id.) Defendants raise three arguments opposing the abuse of process claim. First, Defendants argue that probable cause for arrest and prosecution exists here and negates abuse of process. (Defs.' Mem. at 18.) Next, Defendants argue that a "malicious abuse of process claim fails because Plaintiff does not

allege that Detective Mackey, Detective Young, or CPS McDonald had a collateral objective in initiating the criminal and Family Court proceedings against her." (Id.) Third, Defendants argue that "Plaintiff fails to allege that Detective Mackey, Detective Young, or CPS McDonald pursued any objective after the initiation of criminal and Family Court proceedings" as is required to state a claim. (Id. at 19.) Defendants are correct on all three and accordingly, their motion for summary judgment is GRANTED on the abuse of process claim.[12]

First, as explained above, Defendants had probable cause both to arrest and charge Slater with the A.F. Assault Charges and to initiate family court proceedings. See supra Parts IV.B. & IV.E. Accordingly, to the extent the abuse of process claim is premised on the A.F. Assault Charges or the family court proceedings, the claim fails as a matter of law.

However, liberally construed, Slater alleges malicious abuse of process with regard to the robbery charge as well. Even so construed, the claim fails. Plaintiff alleges that she was arrested and charged with robbery because the Defendants wished to exhibit their authority over her. (Am. Compl. at ECF p. 18.) Such a claim speaks only to the Defendants' motive, not to a collateral purpose. The Second Circuit's decisions in Savino v. City of New York, 331 F.3d 63 (2d Cir. 2003), is instructive. There, the plaintiff alleged that his investigation and arrest "was solely motivated to seek vindication for the [city's] great political embarrassment and humiliation for allowing plaintiff to be the highest paid [city] employee through his overtime earning which was widely reported in the news media for several years and to punish plaintiff for his lawfully and properly earned overtime compensation." Id. at 77-78. The Second Circuit held that the plaintiff could not state a claim because such an allegation did not allege an improper collateral objective. Id. Likewise, here, Slater alleges that she was arrested and charged with

---

[12] It appears that Slater also attempts to allege a claim against the Judge in the Family Court case. That claim fails. First, Slater has not named or served the family court judge. More important, the judge would be protected by absolute immunity. Bliven v. Hunt, 579 F.3d 204, 209 (2d Cir. 2009).

robbery so that Defendants could exhibit their power over her. However, she does not allege—much less produce any evidence showing—that the Defendants had an ulterior purpose, other than securing conviction, in pursuing the charge. Consequently, Slater's abuse of process claim premised on the robbery charge fails.

Moreover, even if Slater could show that Defendants illegitimately sought process against her on the robbery charge, she has neither alleged nor adduced evidence that the Defendants pursued a collateral objective after the issuance of process. Absent such evidence, the abuse of process claim fails. Accordingly, Defendants' motion for summary judgment is GRANTED with regard to Slater's abuse of process claim.

### I. Exposure of a Minor to Toxins and a Website Promoting Nudity

Slater alleges that "[w]hile Plaintiff's children has been in the care of ACS, Plaintiffs [sic] Minor Child was subjected to Liquor at parties." (Am. Compl. at ECF p. 19.) Slater also alleges "[w]hile Plaintiff's children has been in the care of ACS, Plaintiff's minor child was subjected to a website that promotes nudity." (Id.)

Slater's claim fails as a matter of pleading. Slater has not alleged any policy or custom that caused her children's purported exposure to liquor at parties or websites that promote nudity. Accordingly, Slater cannot state a claim of municipal liability. In addition, Slater has not alleged that any individual had any involvement with her children's purported exposure to liquor at parties or websites that promote nudity. Accordingly, no claim has been stated against any plausible defendant at this time. Consequently, Slater's claim is DISMISSED WITHOUT PREJUDICE.

### V. CONCLUSION

For the reasons stated above, the court rules as follows:

- Defendants' motion for summary judgment is GRANTED for all claims against the City, the 63rd Precinct, ACS, and the NYPD.

- Defendants' motion for summary judgment is GRANTED on the false arrest, false imprisonment, excessive force, malicious prosecution claims related to the Neglect Petitions, intentional infliction of emotional distress, and malicious abuse of process.

- Defendants' motion for summary judgment is GRANTED on the malicious prosecution claim against the Police Defendants to the extent the claim concerns the assault of A.F.

- Defendants' motion for summary judgment is DENIED on Plaintiff's false allegations of mental illness claim to the extent it is premised on a misrepresentation claim.

- Plaintiff's malicious prosecution claim against the Police Defendants concerning the robbery charge, fraud on the court claim, false allegation of drug abuse claim, exposure of a minor to toxins claim, and exposure of a minor to a website that promotes nudity claim are DISMISSED WITHOUT PREJUDICE.

Should Slater wish to address the pleading defects in her malicious prosecution of robbery claim, fraud on the court claim, false allegation of drug abuse claim, exposure of a minor to toxins claim, or exposure of a minor to a website that promotes nudity claim, she is instructed to file a Second Amended Complaint by December 15, 2015.[13] The parties are directed to contact the chambers of Magistrate Judge Robert M. Levy in order to determine the schedule for any remaining discovery and any further motion practice.

     SO ORDERED.

s/Nicholas G. Garaufis

Dated: Brooklyn, New York
     November ⨍, 2015

NICHOLAS G. GARAUFIS
United States District Judge

---

[13] Plaintiff is advised that a Second Amended Complaint will completely replace both the original Complaint and the Amended Complaint. Therefore, any new amendment must include all the claims Slater intends to pursue against all Defendants. However, Slater is cautioned that she is not permitted to re-plead her claims against the 63rd Precinct, ACS, and the NYPD, or to re-plead her claims of false arrest, false imprisonment, excessive force, malicious prosecution claims against related to the Neglect petitions, intentional infliction of emotional distress, and malicious abuse of process.